THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

* * * * *

UNITED STATES OF AMERICA      *    NO. H-14-CR-250
                              *    Houston, Texas
VS.                           *
                              *    3:05 p.m. – 3:37 p.m.
PHILIP JOSEPH RIVKIN          *    June 23, 2014

* * * * *

**DETENTION HEARING/ARRAIGNMENT**
**(Volume 1 of 2)**

BEFORE THE HONORABLE MARY MILLOY
UNITED STATES MAGISTRATE JUDGE

* * * * *

Proceedings recorded by electronic sound recording
Transcript produced by transcription service

*GLR TRANSCRIBERS*
9251 Lynne Circle
Orange, Texas 77630 * 866-993-1313

1    **APPEARANCES:**

2    For the United States:

3         MS. LESLIE F. LEHNERT
          **Environmental Crimes Section**
4         **U.S. Department of Justice**
          P.O. Box 7611
5         Ben Franklin Station
          Washington, D.C. 20044-7611

6
     For the Defendant:

7
          MS. LINDSAY A. BELLINGER
8         **Federal Public Defender's Office**
          440 Louisiana, Suite 1350
9         Houston, Texas 77002

10   Pretrial Services Office:

11        DAVID HERNANDEZ

12   Court Clerk:

13        CYNTHIA JANTOWSKI

14   Electronic Recorder:

15        PAUL YEBERNETSKY

16

17

18

19

20

21

22

23

24

25

1                           **I N D E X**

2    GOVERNMENT'S EVIDENCE:

3         Agent Michael Lombard

4              Direct Examination by Ms. Lehnert........  6

5              Cross-Examination by Ms. Bellinger....... 18

6         Agent Lea Bauer

7              Direct Examination by Ms. Lehnert........ 26

8              Cross-Examination by Ms. Bellinger....... 29

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2                **3:05 P.M. — JUNE 23, 2014**

3              THE COURT:  All right, this is *United States*

4    *of America vs. Philip Joseph Rivkin, also known as*

5    *Felipe Poitan Arriaga.*  This matter is set for a

6    Probable Cause Hearing and Detention Hearing, but it's

7    now been indicted, so we're here for, I guess, a

8    Hearing on Detention and Arraignment, if you wish,

9    Ms. Bellinger.

10             MS. BELLINGER:  Yes, Your Honor.

11             THE COURT:  Okay.

12             MS. BELLINGER:  I have reviewed the Indictment

13   for Mr. Rivkin.  He's prepared to plead not guilty and

14   he would waive formal reading of the Indictment and

15   would like to proceed with a Detention Hearing.

16             THE COURT:  Okay.  Have you had a chance to

17   read the Pretrial Services Report?

18             MS. BELLINGER:  Yes, I have, Your Honor.

19             THE COURT:  Anything in there that you can

20   contend is an error of fact?

21             MS. BELLINGER:  No, not to my knowledge, Your

22   Honor.

23             THE COURT:  All right.  Anything, Ms. Lehnert,

24   that you contend is an error of fact?

25             MS. LEHNERT:  Yes, Your Honor.

1          THE COURT:  Okay, what's that?

2          MS. LEHNERT:  The address that's listed under

3  the defendant's name, we believe, is an error.

4          THE COURT:  Okay.  And what's his address?

5          MS. LEHNERT:  We actually don't know.  We've

6  checked out this address, and as the agent will be

7  able to testify, Your Honor, it does not belong to

8  Mr. Rivkin.

9          THE COURT:  All right, well, I'll listen to

10  that testimony.

11          All right, other than that, I'll take as

12  true those matters set out in the Pretrial Services

13  Report.

14          Do you have a witness, Ms. Lehnert, on the

15  question of pretrial detention?

16          MS. LEHNERT:  Yes, I do, Your Honor.

17          THE COURT:  All right, call your first witness.

18          MS. LEHNERT:  The United States calls Michael

19  Lombard.

20          THE COURT:  Lombard?

21          MS. LEHNERT:  Lombard.

22          THE COURT:  Okay, Lombard.  Come forward, sir.

23          MS. LEHNERT:  Your Honor, is it okay if I

24  sit --

25          THE COURT:  Not really.  Oh, you can sit for

1    questioning.

2            *[Oath administered by clerk]*

3         **AGENT MICHEAL LOMBARD, CALLED BY GOVERNMENT**

4                   **DIRECT EXAMINATION**

5    **BY MS. LEHNERT:**

6    Q.   Agent Lombard, would you please state your full for

7    the record?

8    A.   Michael Lombard.

9    Q.   And what is your position?

10   A.   I am a Special Agent employed by the United States

11   Secret Service here in Houston, Texas, currently

12   assigned to the Houston Area Fraud Task Force.

13   Q.   How long have you held that position?

14   A.   Six years.

15   Q.   And what sort of training have you had as Special

16   Agent for the Secret Service?

17   A.   I attended the Federal Law Enforcement Training

18   Center in Glynco, Georgia, as well as the U.S. Secret

19   Service Academy in Beltsville, Maryland.

20   Q.   And what sorts of crime do you investigate as part

21   of the Houston Fraud Task Force?

22   A.   Mail fraud, wire fraud, money laundering, access

23   device fraud, all things fraud.

24   Q.   Do you know Philip Joseph Rivkin?

25   A.   I do.

1    Q.   And do you see him in the courtroom today?

2    A.   Yes.

3    Q.   Would you identify him, please, for the record?

4    A.   He's the gentleman in the orange jumpsuit.

5    Q.   And how is it that you know that to be Philip

6    Rivkin?

7    A.   Through a case that several of my co-workers and my

8    squad was investigating.

9    Q.   And in general terms, what was the nature of that

10   case?

11   A.   It involved fraud -- mail fraud, wire fraud, money

12   laundering.  And the source, I guess would be the best

13   way to put it, would be selling of biodiesel to various

14   companies and to obtain tax credits.

15   Q.   When did you first encounter Mr. Rivkin?

16   A.   Personally in Guatemala last Wednesday.

17   Q.   Would that be June 18th?

18   A.   Yes.

19   Q.   And how did you happen to be in Guatemala on June

20   18th of 2014?

21   A.   I flew down to conduct a surveillance on Mr. Rivkin

22   for his expulsion from Guatemala and subsequent return

23   flight to the United States.

24   Q.   And prior to going down there, down to Guatemala,

25   had you familiarized yourself with any documentation

1  related to Mr. Rivkin?

2  A.   Yes.  I went over some documentation provided by --

3  provided by the Guatemalan authorities.

4         MS. LEHNERT:  Your Honor, I have a couple of

5  exhibits I'd like to show the witness.  May I approach?

6         THE COURT:  All right.

7         *[Pause]*

8  BY MS. LEHNERT:

9  Q.   Agent Lombard, do you recognize these documents

10 that have been marked as Government's Exhibit 1 and

11 Exhibit 2?

12 A.   Yes, I do.

13 Q.   And what are they?

14 A.   They are screen shots of the Guatemalan Civil

15 Registry.

16 Q.   And what is your understanding of what those

17 documents show?

18 A.   Right here on Exhibit 1 it shows Philip Rivkin, how

19 he has changed his last name to Poitan Arriaga.  And

20 then on Exhibit 2 it is actually Mr. Rivkin purporting

21 to be a Guatemalan citizen by the name of Felipe Poitan

22 Arriaga.

23 Q.   And with respect to Exhibit No. 1, what's the date

24 on that?

25 A.   February 23, 2012.

1  Q.   And with Exhibit 2, what is the date on that

2  exhibit?

3  A.   October 5, 2012.

4  Q.   And again, you got these exhibits from where --

5  these documents, excuse me?

6  A.   Guatemalan authorities.

7  Q.   And how did those come -- how did the Guatemalan

8  authorities happen to get these documents to you?

9  A.   Via email.

10  Q.   And were you working with any other agents in

11  conjunction with securing these documents?

12  A.   Yes, the Department of Homeland Security actually

13  has a legal attache office down there, so we were

14  working with Homeland Security Investigations.

15  Q.   So, based on these documents, did you understand

16  that Mr. Rivkin was going to be expelled from

17  Guatemala?

18  A.   Yes, I did.

19  Q.   And based on that understanding, did you then go to

20  Guatemala on June 18, 2014?

21  A.   Yes.

22  Q.   Did you arrest Mr. Rivkin in Guatemala?

23  A.   No.

24  Q.   What did you do while you were in Guatemala?

25  A.   Specifically, I ate lunch, used the restroom and

1  got on an airplane back to the United States.

2  Q.   And what was Mr. Rivkin doing during this time?

3  A.   Waiting for the flight back to the United States.

4  Q.   And did Mr. Rivkin get on the flight that you were

5  on?

6  A.   Yes.

7  Q.   And what did you do on that flight back to the

8  United States?

9  A.   Watched my iPad.

10 Q.   Was Mr. Rivkin on the plane with you?

11 A.   Yes, he was.

12 Q.   Was he in custody during that time?

13 A.   No.

14 Q.   When you landed in Houston, what happened to

15 Mr. Rivkin at that time?

16 A.   He was taken into custody by authorities.

17 Q.   Who took him into custody?

18 A.   U.S. Secret Service Agents, CVP, Customs and Border

19 Protection, as well, which pretty much facilitated the

20 Secret Service Agents getting through the security at

21 the airport.

22 Q.   After Mr. Rivkin was taken into custody, what

23 happened to him?

24 A.   He was read his rights and brought to a Federal

25 Detention Center.

1  Q.   And was he processed at the Secret Service Office?

2  A.   Oh, yes, he was, he was fingerprinted.

3  Q.   And what did those fingerprinting results show?

4  A.   It was, in fact, Philip Rivkin.

5  Q.   And that was based on what?

6  A.   An AFIS hit.  His fingerprints.

7  Q.   And as a part of taking Mr. Rivkin into custody,

8  were his personal belongings collected by the Secret

9  Service?

10 A.   Yes, they were.

11        MS. LEHNERT:  Your Honor, if I may approach

12 the witness again?

13        THE COURT:  Yes.

14 BY MS. LEHNERT:

15 Q.   Agent Lombard, if I could have you take a look at

16 what's been marked as Government's Exhibit 3.  Do you

17 recognize that document?

18 A.   Yes, I do.

19 Q.   And what is it?

20 A.   The Expulsion Order from the Guatemalan Government

21 to Mr. Rivkin.

22 Q.   And based on the language in the Expulsion Order,

23 what is your understanding of why Mr. Rivkin was being

24 expelled from Guatemala?

25 A.   For breaking the law to obtain his Guatemalan

1  citizenship.  So immigration problems.

2  Q.   Referring you back to Exhibits 1 and 2, is there an

3  identification number on Exhibits 1 and 2?

4  A.   Yes.

5  Q.   And do those -- how do those identification numbers

6  compare?

7  A.   They match up.

8  Q.   When Mr. Rivkin was taken into custody at IAH on

9  June 18th, is it your understanding that there was an

10 arrest warrant for him at that time?

11 A.   Yes.

12 Q.   And what was the nature of the case that was being

13 charged in the arrest warrant?

14 A.   Mail fraud.

15 Q.   And is it your understanding that an Indictment has

16 now been returned against Mr. Rivkin?

17 A.   Yes.

18 Q.   And what is your understanding of the nature of the

19 charges against Mr. Rivkin?

20 A.   Mail fraud, wire fraud, money laundering.

21 Q.   There are also charges related to EPA statutes?

22 A.   Yes, Clean Air Act violations.

23 Q.   What is your understanding of Mr. Rivkin's business

24 when he was in Houston?

25 A.   Mr. Rivkin would purport to make biodiesel and, in

1   doing so, would be able to obtain RINs, which is a

2   credit basically assigned to the biodiesel.  He would

3   sell those credits to energy providers and he would

4   also get the tax credits from making the biodiesel from

5   the Federal Government.

6   Q.   And did he actually make any biodiesel?

7   A.   No.

8   Q.   And were employees of his facility and engineers at

9   his facility interviewed in order to confirm that no

10  biodiesel was made?

11  A.   Yes.

12  Q.   During the course of the investigation, were EPA

13  documents reviewed in order to determine what he had

14  submitted to EPA and whether there was false

15  information there?

16  A.   Yes.

17  Q.   And again, was there any indication that he had

18  actually produced any biodiesel?

19  A.   In the documents Mr. Rivkin submitted or in what we

20  learned throughout our investigation?

21  Q.   What you learned throughout your investigation.

22  A.   Mr. Rivkin did not make biodiesel.

23  Q.   Did he submit documents to EPA suggesting that he

24  did?

25  A.   Yes.

1  Q.   Did you also communicate or interview any of the

2  purchasers of the RINs that Mr. Rivkin generated?

3  A.   Yes.

4  Q.   And did you determine that Mr. Rivkin had, in

5  fact, sold these credits to a number of different

6  entities?

7  A.   Yes.

8  Q.   And based on your investigation, what is your

9  understanding of how much money Mr. Rivkin made from

10 selling these credits?

11 A.   In excess of $75 million, and that does not include

12 the tax credit, which I believe was about approximately

13 $21 million from the Federal Government.  So right

14 around a hundred million, give or take.

15 Q.   And all of this was based on biodiesel that

16 Mr. Rivkin claimed to have produced?

17 A.   Yes.

18 Q.   But he did not, in fact, produce?

19 A.   Correct.

20 Q.   During the course of your investigation, did you

21 determine where the $75 million is?

22 A.   It is outside of the U.S. Government's

23 jurisdiction.  So, for all intents and purposes, we

24 tracked it as far as we could and it appears to be

25 overseas.

Agent Michael Lombard - Direct by Ms. Lehnert                   15

1   Q.   Is it your understanding that EPA, as part of its

2   investigation, conducted an inspection of Mr. Rivkin's

3   biodiesel plant?

4   A.   Yes, they did.

5   Q.   Do you know when they did that?

6   A.   If I remember correctly, it was approximately

7   August of 2011.

8   Q.   And at some time after that, did Mr. Rivkin move to

9   Spain?

10  A.   Yes, shortly thereafter.

11  Q.   And who did he move with?

12  A.   His wife and child.

13  Q.   And since sometime after August 2011, when

14  Mr. Rivkin moved to Spain, has he since moved back to

15  the United States?

16  A.   No.

17  Q.   Do you have any understanding about when he went to

18  Guatemala?

19  A.   If you look at Exhibit 2 -- I'm sorry, Exhibit 1,

20  I believe the date here is, so the beginning of 2012,

21  February of 2012.  At least, that is when he started to

22  apply for Guatemalan citizenship.

23  Q.   Based on what you've learned about Mr. Rivkin, has

24  he traveled internationally?

25  A.   Yes, extensively.

1  Q.   And what do you base that on?

2  A.   Review of his U.S. passport records and then the

3  passport records that the Guatemalan officials gave to

4  us, as well.

5  Q.   And is the travel with respect to the Guatemalan

6  passport under the name of Philip Rivkin or is it under

7  a different name?

8  A.   Kind of to break it down, at the beginning of --

9  the end of 2011, beginning of 2012, Mr. Rivkin was

10 still traveling on his U.S. passport.  And then at one

11 point in time here he obtained citizenship in Guatemala

12 under the name Felipe Poitan Arriaga.  And then when

13 you compare his Guatemalan travel on his -- I'm sorry,

14 his travel under his Guatemalan passport, he

15 exclusively uses that when traveling and his U.S.

16 passport  basically stops being utilized.

17 Q.   At about what time was that?

18 A.   Mid-2012.  It kind of -- the U.S. one kind of

19 dwindles down and then Guatemalan gets hot and heavy

20 especially once the name is changed.

21 Q.   Does Mr. Rivkin have any family in Houston at this

22 time?

23 A.   Not that I'm aware of.

24 Q.   Does he own any property in Houston?

25 A.   No.

1  Q.   Does his wife own any property in Houston?

2  A.   No.

3  Q.   Are you aware of an artwork collection belonging to

4  Mr. Rivkin that was seized?

5  A.   Yes, I am.

6  Q.   And when was that artwork collection seized?

7  A.   It was seized back in 2012.

8  Q.   And where was it seized?

9  A.   New Jersey.

10  Q.   And where was it going?

11  A.   It was going to Spain.

12  Q.   What's the estimated value of the artwork that was

13  seized?

14  A.   15 to 16 million dollars.

15  Q.   Did Mr. Rivkin file any sort of claim with respect

16  to the seizure of that artwork?

17  A.   No, he did not.

18  Q.   Based on your investigation, what is the name that

19  you have come to learn that Mr. Rivkin travels under?

20  A.   He travels under the name Felipe Poitan Arriaga.

21          MS. LEHNERT:  Your Honor, I have nothing

22  further at this time.

23          THE COURT:  Ms. Bellinger?

24          MS. BELLINGER:  May I proceed, Your Honor?

25          THE COURT:  Yes.

1                              **CROSS-EXAMINATION**

2    **BY MS. BELLINGER:**

3    Q.   Good afternoon, Agent Lombard.

4    A.   Good afternoon.

5    Q.   Are you the case agent in charge of this

6    investigation?

7    A.   I am an agent that assisted a little bit on the

8    case.

9    Q.   Okay.  When did you begin investigating this case

10   personally?

11   A.   Well, personally, I didn't investigate it.  I

12   participated in several things.  Probably 2011, 2012.

13   It's been going on for a while, so --

14   Q.   And who is the case agent in charge of this case?

15   A.   Lea Bauer from the U.S. Secret Service.

16   Q.   Okay.  Have you prepared any reports in connection

17   with this case?

18   A.   I have not.

19   Q.   And what information have you reviewed in order to

20   prepare for your testimony today?

21   A.   I've reviewed some bank records that were spread

22   by other agents in my squad, the pivot tables.  I've

23   reviewed the Indictment, the Criminal Complaint, the

24   seizure of the artwork, the documents provided to me by

25   the Guatemalan Government through the Homeland Security

1    investigator down there, and some documents, U.S.

2    passport documents, to include border crossings.

3    Q.  So, is all of the information that you testified to

4    today regarding the wire fraud, mail fraud, and money

5    laundering counts, as well as the false statement

6    count, was all of that information obtained from the

7    Indictment and Criminal Complaint in this case?

8    A.  And through talking with agents involved in the

9    case.

10   Q.  Which agents did you speak with?

11   A.  Lea Bauer and then Sarah Bullock.

12        MS. BELLINGER:  Your Honor, at this time we

13   believe that in order for the Court to properly assess

14   the weight of the evidence in this case, pursuant to

15   18 U.S.C. 3142(d)(2), we would need an agent with

16   firsthand knowledge of the investigation in this case

17   in order to determine the weight of the evidence with

18   regards to detention.

19        THE COURT:  I don't know whether Mr. Lombard

20   has the information or not.  You can ask him.  I'm not

21   sure you need the case agent if he spoke with the case

22   agent.  Hearsay is admissible.

23        MS. BELLINGER:  Well, Your Honor, he --

24        THE COURT:  So why don't you go ahead and ask

25   him before we get to the case agent, okay?

1               Thank you, Ms. Bellinger.

2    BY MS. BELLINGER:

3    Q.   Have you reviewed any reports created by the

4    agents, Lea Bauer and Sarah Bullock?

5    A.   I reviewed -- again, like I said, I reviewed bank

6    records that were put into spreadsheets.

7    Q.   So you have not reviewed any reports in this case?

8    A.   I'm not sure what you're asking by reports.   I

9    mean, we don't just sit there and generate reports.

10   Q.   Okay.

11   A.   In a fraud case, typically, what matters is the

12   bank records.

13   Q.   Okay.  So you're saying that if Agent Lea Bauer and

14   Agent Sarah Bullock prepared reports, either reports of

15   interviews that they had conducted or other case

16   related reports, that you haven't reviewed them?

17   A.    I have talked to the agents.

18            MS. BELLINGER:  May I have a moment, Your

19   Honor?

20            THE COURT:  Sure.

21            *[Pause]*

22            MS. BELLINGER:  Thank you, Your Honor.

23            THE COURT:  Okay.

24   BY MS. BELLINGER:

25   Q.   Okay.  To your knowledge, based on your testimony,

1  no biodiesel was ever produced at the Green Diesel

2  facility?

3  A.   Correct.

4  Q.   Do you know if any biodiesel was produced at any

5  other facility owned by Mr. Rivkin or operated by one

6  of his companies?

7  A.   No.

8  Q.   And how do you know that no biodiesel was ever

9  produced?

10  A.   Through speaking with the case agents who conducted

11  the interviews.

12  Q.   And who did the case agents interview to determine

13  that no biodiesel was produced?

14  A.   Employees.

15  Q.   Do you have the names of the employees that they

16  interviewed?

17  A.   I do not.

18  Q.   Who inspected the facility where the biodiesel was

19  allegedly not produced?

20  A.   The EPA.

21  Q.   Okay.  Have you inspected the facility?

22  A.   I wouldn't -- no.

23  Q.   Do you know if -- whomever inspected the facility,

24  do you know if they encountered equipment that would be

25  used to create biodiesel?

1   A.   No.

2   Q.   They did not encounter the equipment or you are not

3   certain?

4   A.   I was not there to inspect the facility.  I would

5   defer that question to the EPA inspectors that

6   inspected the facility.

7           MS. BELLINGER:  Your Honor, I believe the

8   answers to these two questions indicate that we would

9   need another witness present to testify as to the

10  weight of the evidence in this case.

11          THE COURT:  Where is Mr. Bauer or Ms. Bauer

12  or --

13          MS. LEHNERT:  Your Honor, Ms. Bauer is here.

14          THE COURT:  All right, let's hear from

15  Ms. Bauer after you finish with Mr. -- are you finished

16  with Mr. Lombard?

17          MS. BELLINGER:  Well, if all the information

18  obtained that Mr. Lombard would testify to was obtained

19  from Ms. Bauer, then --

20          THE COURT:  That's my understanding, that you

21  would reviewed bank records?

22          THE WITNESS:  Yes.  Yes, ma'am.

23          THE COURT:  But that Ms. Bauer is a lead

24  agent; is that correct?

25          THE WITNESS:  Correct.  There are several lead

1  agents.

2          THE COURT:  Exactly.

3              I do have one question for you.  How did

4  you find out that Guatemala -- if you are the one who

5  found out, that Guatemala was going to expel

6  Mr. Rivkin?

7          THE WITNESS:  The Homeland Security

8  investigator down there actually was -- he's an

9  Assistant Legal Attache and the Guatemalan had

10 approached him because they were looking into

11 Mr. Rivkin allegedly for some fraudulent business

12 dealings.

13         THE COURT:  In Guatemala?

14         THE WITNESS:  Yes, ma'am.  And the Guatemalan

15 HSI -- well, the HSI Agent assigned to Guatemala

16 conducted a Google search and found the artwork seizure

17 in New Jersey, and that's kind of how --

18         THE COURT:  Do you know anything about this

19 art seizure or would Ms. Bauer know that, as well?

20         THE WITNESS:  I know a little bit about it,

21 but Ms. Bauer would know about it, too.

22         THE COURT:  Okay, thank you.

23         MS. BELLINGER:  And, Your Honor, I apologize.

24 may I actually ask some additional --

25         THE COURT:  Sure.

1          MS. BELLINGER:  -- questions about the

2   Guatemala --

3          THE COURT:  Sure.

4          MS. BELLINGER:  Thank you.

5   BY MS. BELLINGER:

6   Q.   Okay.  Agent Lombard, do you know if Mr. Rivkin

7   returned to the United States voluntarily or

8   involuntarily at this time?

9   A.   From?

10  Q.   From Guatemala.

11  A.   You would have to ask Mr. Rivkin that.

12  Q.   Okay.  So did --

13  A.   He was expelled -- he was expelled from Guatemala,

14  so --

15  Q.   Did he --

16  A.   -- I can't answer.

17  Q.   To your knowledge, did he purchase a ticket back to

18  the United States?

19  A.   You would have to ask Mr. Rivkin that.

20  Q.   Okay.  To your knowledge, would he have been able

21  to travel back to Spain?

22  A.   Well, he's a U.S. citizen and has a U.S. passport,

23  and the only passport that I was aware of was the

24  fraudulent one, which reported him to be a Guatemalan

25  citizen.  So, based off of that, I would assume you

1  would have to go back to the U.S., but --

2  Q.   And is that because the Guatemalan Government

3  deported him back to his country of origin?

4  A.   He was expelled from Guatemala.

5  Q.   Okay.  So you have no knowledge as to whether or

6  not the Guatemalan Government bought his ticket back to

7  the United States or he bought it personally?

8  A.   You would have to ask him.

9  Q.   Okay.  Did you speak with Mr. Rivkin at all during

10  that flight?

11  A.   No.

12          MS. BELLINGER:  Nothing further, Your Honor.

13          MS. LEHNERT:  Nothing further for this

14  witness, Your Honor.

15          THE COURT:  All right.  You can step down,

16  Mr. Lombard.

17          THE WITNESS:  Thank you.

18          THE COURT:  Thank you.

19              You want to call Ms. Bauer?

20          MS. LEHNERT:  Your Honor, I would like to make

21  the Court aware of the fact that Ms. Bauer -- Agent

22  Bauer was a witness in the Grand Jury and we did not

23  anticipate calling her at today's hearing, and so there

24  is at least a transcript that is not something I can

25  provide to defense counsel at this time.

1         THE COURT:  Well, I wouldn't expect you to and

2    they're not going to ask you for it at this hearing.

3         MS. BELLINGER:  Well, Your Honor, depending

4    on --

5         THE COURT:  Well, let's not get into the Grand

6    Jury testimony.  Let's just hear from Ms. Bauer on the

7    3142(g), the weight of the evidence.

8              Ms. Bauer, come forward.

9         *[Oath administered by the case manager]*

10             You want to question her first?

11        MS. LEHNERT:  Yes, please, briefly.

12        THE COURT:  Okay.  Go ahead.

13      **SPECIAL AGENT LEA BAUER, CALLED BY GOVERNMENT**

14                  **DIRECT EXAMINATION**

15   BY MS. LEHNERT:

16   Q.  Agent Bauer, could you state your name for the

17   record.

18   A.  Yes, my name is Lea Bauer.  I am a Special Agent

19   with the United States Secret Service.  I have been

20   with the Secret Service for 15 years.

21   Q.  And during the course of your time with the Secret

22   Service, did you have occasion to investigate

23   Mr. Philip Joseph Rivkin?

24   A.  Yes, I have.

25   Q.  And during the course of that investigation, did

1   you interview employees and engineers at the biodiesel

2   facility that Mr. Rivkin came to operate?

3   A.   Yes, myself and my partners.

4   Q.   And who did you speak to at his facility?

5   A.   Specifically a name, do you want me to --

6   Q.   Yes.

7   A.   It was a Mr. Khan, who was the actual plant

8   manager, and a Mr. Harvey Greenwood, who was the

9   engineer.

10  Q.   And based on your interviews with those people, did

11  you determine whether the facility operated?

12  A.   Both of those individuals told us that the facility

13  never operated.  In fact, they had discussed this with

14  Mr. Rivkin, that they were having problems getting it

15  to operate.  The electricity was not turned on and

16  there was not steam available to actually make the

17  plant operate.

18  Q.   And subsequent to those discussions with Mr. --

19  that those employees had with Mr. Rivkin, did

20  Mr. Rivkin then submit paperwork to EPA claiming to

21  produce biodiesel?

22  A.   Yes, he did.

23  Q.   And during the course of submitting paperwork to

24  EPA, how many RINs did Mr. Rivkin claim to produce over

25  the course of the years that he was submitting

1  paperwork to EPA?

2  A.   It was at least 30 million RINs, that he claimed to

3  have made somewhere between 30 million and 60 million

4  in our records.

5  Q.   And based on your interviews, there was no

6  biodiesel to support those RINs?

7  A.   No, there was not.

8  Q.   And based on your review of the bank records, the

9  money that Mr. Rivkin received for selling those RINs

10  went where?

11  A.   The best that we could tell, there was a large

12  amount of money that moved back and forth over a number

13  of months and then left the country.  It was very

14  difficult to trace because there were a lot of

15  intermediary wire companies used.  But we have not been

16  able to find any of that money in the United States.

17  Q.   And the money that Mr. Rivkin received for the RINs

18  came from where?

19  A.   The majority of it came from the energy companies

20  that purchased the invalid or fraudulent RINs.  And

21  then there was some portion of it that actually came

22  from tax credits from the United States Government that

23  were fraudulently applied for.

24         MS. LEHNERT:  Nothing further, Your Honor.

25         THE COURT:  Ms. Bellinger.

1          MS. BELLINGER:  May I proceed, Your Honor?

2          THE COURT:  Yes, you may.

3                    **CROSS-EXAMINATION**

4  **BY MS. BELLINGER:**

5  Q.  Good afternoon, Agent Bauer.

6  A.  Hi.

7  Q.  In order to prepare for your testimony here today,

8  did you review any reports that you prepared in this

9  case?

10 A.  I was not prepared to testify, so, no, I didn't do

11 any specific review.

12 Q.  Have you prepared any reports in this case?

13 A.  I have prepared a few.

14 Q.  What type of reports have you prepared?

15 A.  Most of what I prepared have been interview

16 reports.

17 Q.  And how many witnesses have you interviewed in this

18 case?

19 A.  I have not participated in as many as some of my

20 partners, but probably five or six.

21 Q.  And have you also reviewed the interview reports of

22 your partners?

23 A.  Yes.

24 Q.  And do you know how many total interviews were

25 conducted?

1  A.   I'm sorry, I don't.  It's a pretty large number.

2  Q.   And out of the five or six interviews that you

3  conducted, were any of those individuals employees

4  working at the Green Diesel facility?

5  A.   Yes, they all were.

6  Q.   And do you have their names?

7  A.   I'm trying to remember.  I'm sorry, I didn't bring

8  my notes with me and I don't remember specifically.  I

9  would have to review notes to know exactly who it was --

10  who I participated in interviews with.

11  Q.   Have you reviewed -- you indicated that you've

12  reviewed other agents' reports of interviews.  Have you

13  also reviewed other agents' investigation reports in

14  this case?

15  A.   No.

16  Q.   So, presumably, you've only reviewed other agents'

17  interview reports and your own reports in this case?

18  A.   Yes.

19         MS. BELLINGER:  Your Honor, at this time we

20  would move, pursuant to Federal Rule of Criminal

21  Procedure 26.2, to review the witness interviews.  And

22  also, I believe, Your Honor, what I was indicating

23  earlier, that pursuant to Rule 26.2(f)(3), also, this

24  witness' statements to the Grand Jury would be

25  something that we would be entitled to review prior to

1   cross-examination.

2          THE COURT:  I don't think you need her Grand

3   Jury testimony at this point, and I'm not sure that

4   those witness statements satisfy 26.2.  So let's

5   proceed, Ms. Bellinger.

6          Ms. Lehnert, do you have any of these

7   witness interviews with you?

8          MS. LEHNERT:  No, Your Honor.  As you are

9   aware, this is a preponderance of the evidence standard

10  and hearsay is admissible.

11         THE COURT:  Okay, let's go.

12         MS. BELLINGER:  Well, Your Honor, I would move

13  for a continuance in order to obtain those.  Rule 26.2

14  is pretty straightforward in indicating that --

15         THE COURT:  Well, it might be as to her Grand

16  Jury testimony, but we're only talking about the weight

17  of the evidence as to her testimony at this point.  So,

18  I mean, I could review that if you want me to reset and

19  review her testimony before we take this up again, but

20  I don't think it's necessary.

21         MS. BELLINGER:  Well, Your Honor, what I'm

22  talking about is actually a rule -- Federal Rule of

23  Criminal Procedure 46(j) indicates that at Detention

24  Hearings, Rule 26.2 is in effect --

25         THE COURT:  I understand that.

1          MS. BELLINGER:  -- which indicates that prior

2    to cross-examining this witness, we would be entitled

3    to review those reports --

4          THE COURT:  If there's something pertinent to

5    her testimony as to the weight of the evidence.

6          MS. BELLINGER:  Yes, Your Honor, and she just

7    indicated that she cannot recall --

8          THE COURT:  Well, she just testified as to two

9    people she talked to:  The plant manager, and who was

10   the other person?

11         MS. LEHNERT:  Engineer.

12         THE COURT:  And the engineer.

13         MS. BELLINGER:  And based on that testimony,

14   Your Honor, we would --

15         THE COURT:  We'll take a recess.  I want to

16   see the Grand Jury testimony and we'll take this up

17   again tomorrow at 3:00.  Thank you so much.

18         MS. BELLINGER:  Thank you.

19         THE COURT:  Are you moving to admit these into

20   evidence?

21         MS. LEHNERT:  Yes.

22         THE COURT:  Any objection to Government's 1,

23   2, and 3?

24         MS. BELLINGER:  No objection, Your Honor.

25         THE COURT:  All right, Government's 1, 2, and

Agent Lea Bauer - Cross by Ms. Bellinger

3 will be admitted.  And get the witness interviews, as
well.

        MS. LEHNERT:  Yes, Your Honor.

        THE COURT:  And I'm not instructing you to
review anything else, I'm just saying get the witness
interviews and let me look at the Grand Jury testimony,
if it's been transcribed.

        MS. LEHNERT:  That will be the one issue, Your
Honor.  I don't know that it has been.

        THE COURT:  Okay, if it hasn't been
transcribed, then don't -- I'm not forcing you to do
that, either.  We'll take this up tomorrow at 3:00.

        MS. BELLINGER:  Your Honor?

        THE COURT:  Yes.

        MS. BELLINGER:  Would I be able to review
those prior to returning at 3:00, assuming that --

        THE COURT:  Sure.

        MS. BELLINGER:  -- we would be resuming at
3:00?

        THE COURT:  If I get to see it before then,
you can get to see it before then.  Thank you.

        MS. BELLINGER:  Thank you, Your Honor.

        THE COURT:  But it may not be transcribed, so
there you have it.

       *[3:37 p.m. - Proceedings recessed]*

C E R T I F I C A T I O N


    I certify that the foregoing is a correct transcript of the electronic sound recording of the proceedings in the above-entitled matter.


/s/ Gwen Reed

8-24-14

*GLR TRANSCRIBERS*
9251 Lynne Circle
Orange, Texas 77630 * 866-993-1313