THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

\* \* \* \* \*

UNITED STATES OF AMERICA     \*     NO. H-14-CR-250
    \*     Houston, Texas
VS.     \*
    \*     3:01 p.m. – 4:01 p.m.
PHILIP JOSEPH RIVKIN     \*     June 24, 2014

\* \* \* \* \*

**DETENTION HEARING/ARRAIGNMENT**
**(Volume 2 of 2)**

BEFORE THE HONORABLE MARY MILLOY
UNITED STATES MAGISTRATE JUDGE

\* \* \* \* \*

Proceedings recorded by electronic sound recording
Transcript produced by transcription service

*GLR TRANSCRIBERS*
9251 Lynne Circle
Orange, Texas 77630 \* 866-993-1313

1  **APPEARANCES:**

2  For the United States:

3      MS. LESLIE F. LEHNERT
        **Environmental Crimes Section**
4      **U.S. Department of Justice**
        P.O. Box 7611
5      Ben Franklin Station
        Washington, D.C. 20044-7611

6  For the Defendant:

7      MS. LINDSAY A. BELLINGER
8      **Federal Public Defender's Office**
        440 Louisiana, Suite 1350
9      Houston, Texas 77002

10 Court Clerk:

11     CYNTHIA JANTOWSKI

12 Electronic Recorder:

13     MARILYN FLORES

14

15

16

17

18

19

20

21

22

23

24

25

1 **I N D E X**

2 GOVERNMENT'S EVIDENCE:

3     Agent Lea Bauer

4         Cross (Continued) by Ms. Bellinger....... 9

5         Redirect Examination by Ms. Lehnert...... 33

6         Recross-Examination by Ms. Bellinger..... 36

7         Examination by the Court................. 38

8 Argument by the United States.................... 42

9 Argument by the Defense.......................... 43

10 Detention ruling by the Court.................... 46

11 Arraignment...................................... 48

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# P R O C E E D I N G S

### 3:01 P.M. – JUNE 24, 2014

1

2

3     THE COURT:  All right.  Ms. Lehnert?

4     MS. LEHNERT:  Yes, Your Honor.

5     THE COURT:  Yesterday I was thinking this was

6  a conspiracy and I needed to look at the Grand Jury

7  testimony to cull through what was pertinent to

8  Mr. Rivkin, but it isn't.  There's only Mr. Rivkin on

9  this Indictment.  But there is no transcript; right?

10     MS. LEHNERT:  We have checked with the Grand

11  Jury coordinator and she indicated that there is no

12  transcript yet.  We could request a transcript

13  expedited and it would be available sometime next week.

14     THE COURT:  Okay, do that.

15     MS. LEHNERT:  Okay.

16     THE COURT:  And what about Ms. Bauer's

17  reports?  Do you have Ms. Bauer's reports?

18     MS. LEHNERT:  I provided your office this

19  morning with copies of four reports of Agent Bauer's,

20  as well as four additional reports that relate to the

21  two witnesses.

22     THE COURT:  No, but those were witness

23  statements.

24     MS. LEHNERT:  Those are her reports.

25     THE COURT:  She didn't make any other reports?

1    MS. LEHNERT:  She made -- there's a motion

2  pending from defense counsel that I'll address, which

3  is there are four other reports that Agent Bauer wrote

4  in the course of the investigation, but they are

5  unrelated to the charges that are pending against

6  Mr. Rivkin, and so we have not produced those because

7  they are not related to the testimony.

8          And I can show you them in camera if you'd

9  like, Your Honor, and you can question Ms. Bauer if

10  you'd like to.

11    THE COURT:  Okay.  Well, I mean, the witness

12  reports that you gave to Ms. Bellinger?

13    MS. LEHNERT:  Yes.

14    THE COURT:  I don't think they fit the

15  definition of the 26.2, so be grateful that you got

16  those, Ms. Bellinger, because those aren't Ms. Bauer's

17  reports.  But Ms. Bauer's reports, you're saying, don't

18  relate to Mr. Rivkin's charges?

19    MS. LEHNERT:  No, we have additional interview

20  reports.  Those are the only reports that I'm aware of

21  from Agent Bauer related to the case are interview

22  reports.

23    THE COURT:  Interview reports.

24    MS. LEHNERT:  That's what they generated.

25    THE COURT:  All right.  Are you aware of

1  anything else, Ms. Bellinger?

2        MS. BELLINGER:  I wouldn't have knowledge --

3        THE COURT:  Yeah.

4        MS. BELLINGER:  -- of what type of reports she

5  had prepared.  I was just requesting a ruling as to if

6  there were additional reports.  I just assumed that

7  based on the matters that she testified to, given

8  moving the money around in various bank accounts, the

9  creation of these RINs, I assume that there was some

10  sort of case report that would have been generated in

11  relation to those things.

12        THE COURT:  I guess I would have assumed so,

13  too, but there's not, Ms. Lehnert?

14        MS. LEHNERT:  Not that I understand.  Now, the

15  agents could -- they produce interview reports as part

16  of the case and then we collaborate --

17        THE COURT:  Okay.  All right.  I take you at

18  your word.  But I'll look at whatever else she has to

19  see if there's anything relative or related to

20  Mr. Rivkin's --

21        MS. LEHNERT:  As I said, I have I believe it's

22  four other reports that she had written.  They are

23  witness statement reports, but they --

24        THE COURT:  Okay.  But they are not related to

25  Mr. Rivkin?

1    MS. LEHNERT:  They do not relate to the charges

2  against Mr. Rivkin.  They were taken in the course of

3  the investigation.  So they mention Mr. Rivkin, but

4  they are not related to the charges.

5    THE COURT:  I may later look at those.  I'm

6  not certain what that means.

7    All right, so I guess you have everything

8  that Ms. Bauer created.  And then when you get the

9  Grand Jury transcript, if there is anything in there

10  that would cause me to reopen the matter of detention,

11  because that's what we're here on, then you can bring

12  it to my attention.

13    All right, so let's go forward.  Is

14  Ms. Bauer here?  All right.

15    MS. BELLINGER:  Your Honor --

16    THE COURT:  We'll continue the hearing.

17    Yes?

18    MS. BELLINGER:  I'm sorry to interrupt.  I

19  guess the point of the rule of 26.2 and as it relates

20  to the Detention Hearing would be that we would be able

21  to review those prior to cross-examining the witness,

22  and that's the whole point of the rule, that we be

23  allowed to review her statements prior to that

24  cross-examination.  So I believe that whatever we were

25  to review later on, I guess I don't see how it could

1  assist us if the hearing had already taken place.

2  THE COURT:  Here's the problem.  The

3  transcript isn't ready.

4  MS. BELLINGER:  Yes, Your Honor.

5  THE COURT:  Under 3142(g) I'm looking at the

6  nature and circumstances of the offense, the weight of

7  the evidence, and Mr. Rivkin's personal history and

8  characteristics.  So the weight of the offense is only

9  one of the factors I need to look at.  So Ms. Bauer can

10  testify as to the weight of the offense.  If there is

11  something in her Grand Jury testimony that you think

12  changes -- would change any of my decision-making in

13  regard to the weight of the offense, the weight of the

14  evidence against him, you can bring that to my

15  attention when the transcript is ready.  But we're

16  going to go forward, okay?

17  MS. BELLINGER:  I guess just for purposes --

18  THE COURT:  You would object?

19  MS. BELLINGER:  I guess our request would be

20  that we would have --

21  THE COURT:  Sure.

22  MS. BELLINGER:  -- that we would request a

23  continuance until such time as we were able to review

24  those.

25  THE COURT:  Sure.  Okay, thank you.  We're

1  going to go ahead and go forward.

2              Ms. Bauer.

3              You were sworn yesterday; right?

4         THE WITNESS:  Yes.

5         THE COURT:  Okay.  You're still under oath.

6         MS. BELLINGER:  May I proceed, Your Honor?

7         THE COURT:  Sure.

8                  **SPECIAL AGENT LEA BAUER**

9                  **CROSS-EXAMINATION (Continued)**

10  **BY MS. BELLINGER:**

11  Q.   Good afternoon, Agent Bauer.

12  A.   Hello.

13  Q.   Okay.  To your knowledge, there was actually

14  biodiesel produced at the Green Diesel facility; is

15  that correct?

16  A.   My understanding is, based on information that was

17  provided to us by Harvey Greenwood and David Khan, that

18  there was a test batch that was produced that was in a

19  very small amount.  It was produced prior to the time

20  period of the RIN sales that we are alleging, and there

21  was never any production after the time period that the

22  RIN sales began for what we're alleging in the

23  Indictment.

24  Q.   And at the time that the RINs were created, I

25  guess, by the person using the PRIVKIN2 password, at

1 the time that those were created, did they refer to the

2 time of the production of the biodiesel?

3 A.  The production of the biodiesel was a couple of

4 years before that.  So my understanding was that those

5 should -- that the RIN production should correspond

6 with biofuel that's produced in that time period, that

7 year, to meet the renewable fuel standard.  So there

8 was not any production during the time in which we have

9 alleged the fraudulent RINs were produced.

10 Q.  So would there have had -- in the creation of the

11 RIN, would there have had to have been a statement as

12 to when the biodiesel was produced that corresponds to

13 that RIN that was created?

14 A.  There are quarterly reports that have to be

15 produced to the EPA by any producer or refiner that is

16 actually making the biodiesel, which would then

17 indicate when it was produced.  And it gets a certain

18 batch number which indicates a lot of things about it.

19 But it would have to be produced during that same year.

20 Q.  So, when the RINs were first created, allegedly, by

21 Mr. Rivkin or his company, what was the date that was

22 given -- what was the corresponding date of production

23 of biodiesel?

24 A.  The RINs that we are alleging are in 2011, from

25 July 2010 to July 2011.

1  Q.  So there was a statement made that the biodiesel

2  had been produced within that same year?

3  A.  That is my understanding, yes.  Those are the

4  quarterly reports that were sent up to the EPA from

5  Mr. Rivkin.

6  Q.  Okay.  And are there differing opinions as to how

7  much biodiesel had been created by Green Diesel, the

8  company?

9  A.  Differing opinions by whom?

10 Q.  By individuals that worked at the plant.

11 A.  The information that we've gotten for during the

12 time frame that we've alleged in the Indictment,

13 everybody tells us the plant was not working, so there

14 was no biodiesel being produced at that time.  There

15 was just the small batch that was produced earlier that

16 was the test batch.

17 Q.  And do you know the size of the test batch?

18 A.  From what Harvey Greenwood told us, it was about

19 63,000 gallons, roughly.

20 Q.  And what would be the amount of biodiesel necessary

21 to correspond to the number of RINs that were created?

22 A.  It would be millions of gallons.

23 Q.  Okay.  And through your witness interviews, did

24 anyone indicate that some additional batches had been

25 created after that time period?

1   A.   From what we were told by -- primarily by Harvey

2   Greenwood and David Khan is that they continued to try

3   and produce "on spec" biodiesel and they were not

4   successful in doing so.

5   Q.   And when you say "on spec", does that mean to meet

6   the specifications -- American specifications or

7   European specifications?

8   A.   Well, these would be American specifications

9   because it was -- these renewable fuels were driven by

10  the EPA here in the United States.

11  Q.   So, during the time of your interviews, did anybody

12  indicate that the biodiesel did meet American

13  specifications, but not European specifications?

14  A.   There was the test batch, and I believe it was

15  Mr. Greenwood that said that it had met -- the small

16  batch had met at one point American specifications, but

17  was not -- from what I understand, the level was much

18  higher to meet for European standards.  But again, it

19  was that small test batch.

20  Q.   And if a person -- in order to create a RIN, could

21  a person also acquire or purchase biodiesel?

22  A.   Yes.

23  Q.   And that would be perfectly legal to purchase the

24  biodiesel and then create a RIN?

25  A.   That is my understanding, yes.

1  Q.   Okay.  And throughout your interviews, did you

2  encounter information that biodiesel had been

3  purchased?

4  A.   We -- the EPA was provided information that

5  biodiesel had been purchased by a company named

6  Sonorawest.  And we ran that out and found out that

7  Sonorawest, in fact, had never existed and that the

8  invoices that Mr. Rivkin provided the EPA to actually

9  show that there were these transactions between Green

10 Diesel and Sonorawest, Fuel Streamers and Sonorawest,

11 they were all, in fact, false.

12 Q.   Okay.  And I guess let me get into that a little

13 bit more.  How did you determine that these invoices

14 were false?

15 A.   The first thing that we did was try to track down,

16 was there an operating Sonorawest company, which we

17 could not locate.  Secondly, we actually looked at the

18 invoices that were created and subpoenaed the book --

19 the records from Quickbooks, which was an online

20 system.  And when we got into there, the way Quickbooks

21 actually captures -- Quickbooks actually captures a

22 time frame in which an invoice was created, and the

23 invoices that were created and submitted to the EPA

24 were created after the time frame that the EPA had

25 requested the documents.  And so therefore, the

1  creation time for the invoice did not match with the

2  date of the invoice, and they were all created after

3  the EPA had asked for the production.

4  Q.  Did the EPA either receive, in request -- in

5  response to their request or later discover any other

6  invoices that would indicate that Green Diesel or any

7  of Mr. Rivkin's companies had acquired biodiesel?

8  A.  Not to my knowledge.

9  Q.  Did any individuals that were interviewed regarding

10 this issue indicate that they thought that biodiesel

11 had been acquired at some time?

12 A.  It was alleged that there was biodiesel that was

13 acquired and was shipped in on a barge.  And we ran

14 down the barge and found out the barge, in fact, never

15 existed, had never actually brought any type of

16 renewable fuel to the United States for Mr. Rivkin to

17 purchase.

18 Q.  Are you aware of the fact that the, I guess -- I'm

19 not sure of the correct word, but basically, the oil

20 that was needed to create biodiesel had been acquired

21 by the company?

22 A.  I know there were some purchases made.  That's not

23 my area of expertise.  And we were specifically looking

24 for was the biodiesel produced, because it had to have

25 been produced in order for him to legitimately actually

1  go in and generate a RIN.

2  Q.   And when the actual facility was inspected, there

3  was equipment present that could have produced

4  biodiesel; is that correct?

5  A.   That's my understanding, but it was not operating.

6  Q.   And how many times did the EPA inspect this

7  facility?

8  A.   To my knowledge, just the August 2011 inspection.

9  Q.   And based on your witness interviews, did anyone

10 ever indicate that biodiesel was created after this

11 original test batch?

12 A.   I think there was some statement that they

13 continued to attempt to create it, but were not able to

14 create biodiesel that -- and this was early on -- that

15 would actually meet standards for it to be sold.  And

16 then eventually the plant just was shut down and quit

17 operating and they started -- they changed it over to a

18 dehydration plant and started just using it for those

19 purposes and for smaller projects that the company was

20 involved in.

21 Q.   And was the dehydration plant dehydrating

22 biodiesel?

23 A.   That's not my area of expertise.  I don't think

24 that -- because I'm not an expert in that area, I don't

25 think the two are synonymous, but I really would rather

1  not comment just because I don't know.

2  Q.   And do you know what type of quantities of

3  non-specification biodiesel may have been produced

4  after the original 60,000?

5  A.   I do not.

6  Q.   To your knowledge, during this time frame, did

7  Mr. Rivkin have other legitimate companies?

8  A.   From our investigation, we found that there were a

9  number of companies that he was operating.  They were

10  all very commingled, if you will.  All of his employees

11  tended to receive their benefits from one company,

12  their paychecks from another company.  And so

13  everything, even though there were a number of

14  companies he was operating, they were all commingled.

15  In all of the interviews that we conducted, the -- in

16  most of the interviews that we conducted, the witnesses

17  told us they were very confused because they thought

18  they went to work for Green Diesel and then it switched

19  over to Fuel Streamers, but they got their insurance

20  from Petro Constructors.  And so it was -- it seemed to

21  be one big company.  Even though there were a number of

22  names, they were all operating synonymously.

23  Q.   In your investigation, did you discover that there

24  was other legitimate business being done by biodiesel

25  specifically?

1  A.   Not biodiesel.  From what I understand, there was

2  a terminal that was being run called the IFL Terminal,

3  which is up near the Houston Intercontinental Airport,

4  and that were -- that was some fuel that was being

5  brought in and sold, was being purchased and sold,

6  small quantities at that particular terminal.  But in a

7  witness testimony, we were told that they were not

8  producing biodiesel at that terminal.

9  Q.   So that was a different type of fuel --

10 A.   Yes.

11 Q.   -- to your knowledge?

12         And I apologize, I misspoke.  Actually, I

13 meant, was there other legitimate business being

14 conducted by Green Diesel, the company?

15 A.   Not that I know of, no.

16 Q.   Do you know -- through your investigation, did you

17 come to find out whether anyone else had access to the

18 "User ID" PRIVKIN2 to access the EMTS system?

19 A.   I believe there was one other employee that was

20 given access and there were employees who were directed

21 to actually produce RINs.  But from all of the employee

22 interviews that we had, we were told that Mr. Rivkin

23 specifically directed and oversaw each of the RINs'

24 purchases.

25 Q.   And who was the other individual who had access to

1   the ID or login?

2   A.   I believe Pierce and Parrish were two of the sellers

3   or buyers that were able to work with him in that.

4   Q.   So those were the two people who had access to that

5   login, to your recollection?

6   A.   To my recollection.  I may -- I may be wrong, but

7   that's what comes to my recollection.

8   Q.   And you indicated that there were more individuals

9   that you allege were directed by Mr. Rivkin to produce

10  the RINs.  So would the system already be logged into

11  and there's a person sitting there --

12  A.   From what we were told, the actual -- that he had

13  an actual RINs Trading Group that actually would go on

14  and trade the RINs, but that they -- he exclusively

15  had access to the PRIVKIN2.  There were some other

16  employees who had their own access at one point, and at

17  one point they actually contracted with a company to

18  handle the RINs creations.  And then he terminated that

19  contract, if you will, and ended up creating them on

20  his own.

21  Q.   So was that -- did he initially have a contract

22  with this company to create the RINs.

23  A.   Yes.

24  Q.   That's how it started?

25  A.   Yes.

1  Q.   Okay.  Which company was that?

2  A.   RINSTAR is the actual name of the program and the

3  company that they used initially.  And then there was

4  apparently a dispute and they separated, went their

5  different ways, and Mr. Rivkin then ended up doing his

6  own RINs.

7  Q.   Do you know what the extent of their involvement in

8  the creation of the RINs was, meaning specifically, did

9  they inspect the plant for production of biodiesel?

10  A.   Not to my knowledge.  All they were was just a

11  conduit by which Mr. Rivkin would then come to them and

12  say:  Okay, we need -- you know, we've produced so many

13  gallons of biodiesel and so, therefore, we need for you

14  to then generate the RINs for us.

15  Q.   And did you interview anybody that worked at that

16  company?

17  A.   Some of my partners did.

18  Q.   Do you know the names of any of those individuals

19  that were interviewed?

20  A.   I personally don't remember.  I mean, you know, we

21  have them listed in records, but I don't remember

22  exactly who it was.

23  Q.   Do you know if Mr. Rivkin provided documentation to

24  that company in order to support the creation of the

25  RINs?

1  A.   My recollection is yes, but I don't want to say

2  that for sure.

3  Q.   So, if they did -- if Mr. Rivkin did provide

4  documentation to generate the RINs, then you would

5  probably have that or the Government would probably

6  have that in its possession?

7  A.   We should have, yes.

8  Q.   In paragraph 37 of your Indictment, you indicated

9  that on January 13, 2012, Mr. Rivkin, through his

10 attorney, provided a false written statement to the

11 EPA's Air Enforcement Division.  And you kind of

12 already addressed this regarding Sonorawest.

13        MS. LEHNERT:  Your Honor, I'm going to have to

14 object here that this is going far afield of just an

15 inquiry into the weight of the evidence.  We're not on

16 trial here.

17        THE COURT:  Well, I'll go ahead and let her

18 ask that question.

19             Go ahead.

20 BY MS. BELLINGER:

21 Q.   Was there an explanation in this letter from

22 Mr. Rivkin and/or of his attorneys of the discrepancy

23 between an earlier representation of the production of

24 biodiesel and the latter assertion that the biodiesel

25 had been purchased to support the RIN creation?

1  A.   There -- yes, to my recollection, there was.

2  Q.   And what was that explanation?

3  A.   What I remember my partners telling me is that he

4  said that he believed that he had followed the spirit

5  of the law as opposed to following the actual law

6  itself for how biodiesel should first be produced and

7  then the RINs generated.  But I'm -- that's what I

8  remember.

9  Q.   But in that letter he or his attorneys stated that,

10 in fact, the entire amount of biodiesel necessary to

11 support the RINs had either been created or obtained?

12 A.   What I remember from the letter was that he said

13 that they had produced biodiesel, when in fact then we

14 found later that they had not.

15 Q.   But then later there was some response that

16 included Sonorawest documentation; is that correct?

17          MS. LEHNERT:  Your Honor, I'd like to object

18 here.  If the defense counsel wants to produce the

19 letter and put that in front of the witness and give

20 the witness a chance to read the letter, that would be

21 fine.  But otherwise, I think she's asking the witness

22 about evidence that's not in front of the witness.

23          MS. BELLINGER:  Your Honor, the only reason I

24 have knowledge of this letter is that it was mentioned

25 in the Complaint and the Indictment.  I don't have a

1  copy of the letter myself, of course.  I'm asking her

2  questions regarding the charges in this case.

3          THE COURT:  Okay.  Do you need the letter?

4          THE WITNESS:  It would be helpful.  I mean, it

5  asks specific questions.  I mean, basically, what we're

6  alleging in the Indictment was that his response was

7  that, yes, that they had in fact, you know, done what

8  they said they did, and we were then able to prove that

9  they had not produced biodiesel.

10          THE COURT:  Okay.  I think she's told you what

11  you wanted to know.

12          MS. BELLINGER:  I understand, Your Honor.

13  Thank you.

14  BY MS. BELLINGER:

15  Q.  Do you know who was in charge of overall

16  supervision of the Green Diesel facility?

17  A.   Apparently, there were a couple of different

18  individuals.  I know early on there was an indication

19  that somebody named Kiki Vong was the plant manager

20  when it was first being built.  And then it was Harvey

21  Greenwood was brought in afterward to try and make the

22  plant work, which he said he was never able to get it

23  working.

24  Q.  And can anyone place Mr. Rivkin at the actual

25  facility after the time that it was constructed, the

1  Green Diesel facility, meaning was Mr. Rivkin seen

2  there by any of the witnesses in this case?

3  A.   I know that I have an interview there with

4  Mr. Huffman where he says he actually went down with

5  Mr. Rivkin to the facility to take a look at it.  And

6  then decided not to actually buy into that particular

7  business with Mr. Rivkin because he didn't believe

8  that it would work.  Other than that, from what I

9  understand, he was pretty vacant and not there very

10 much.

11 Q.   And what do you mean by -- oh, he was not --

12 A.   He did not go to the facility very often.

13 Q.   The facility, okay.

14 A.   From what I understand.

15 Q.   And do you know what he may have learned while at

16 the facility, while visiting?

17 A.   Well, he was apparently told by his employees that

18 it was not working.

19 Q.   And what was that time period that he was notified

20 that it was not working?

21 A.   That was around, if I'm remembering correctly,

22 2009.

23 Q.   And between 2009 and 2011, Mr. Khan left to build a

24 new facility?

25 A.   He -- from what I was told, he went down to the

1  Harlingen facility, where they do actual just
2  construction of components, and then left to go over to
3  Selma, Alabama, where he was to build a new facility
4  there.  And that one, you know, was never completed.
5  Mr. Rivkin pulled out of it and so they kind of walked
6  away from Selma.
7  Q.   Did you interview anyone that was still at the
8  facility while it was presumably operating between 2009
9  and 2011?
10  A.   At the Green Diesel --
11  Q.   Yes.
12  A.   -- facility?
13  Q.   Yes.
14  A.   Well, while it was still operating?
15  Q.   Yes.
16  A.   It never fully operated and it didn't operate after
17  2009.
18  Q.   Okay.  Were there some workers present during this
19  time period?
20  A.   From what we were told, there were some workers
21  that would go in.  We had one witness that would tell
22  us they would go in and do oil changes and kind of
23  machinery work, but it was not being used for the
24  purposes of producing biodiesel.
25  Q.   And you understood that there was a dehydration

1  system put into place or it was being utilized for that

2  purpose?

3  A.   That's what one of the eyewitnesses said, yes.

4  Q.   Okay.  So it was operational in some capacity

5  between 2009 and 2011?

6  A.   Well, in the sense that they were dehydrating, yes.

7  They were pulling water off of fuel, but not operating

8  for the production of biodiesel.

9  Q.   And you indicated you weren't certain what type of

10 fuel they were dehydrating, that that was beyond your

11 expertise?

12 A.   Yes.

13 Q.   Okay.

14 A.   I'd have to hazard a guess, which I would prefer

15 not to do.

16 Q.   Okay.  Do you have any copies of internally

17 prepared financial statements of the company for the

18 period that the RINs were being created?

19 A.   What type of statements are you referring to?

20 Q.   In your investigation, did you review any

21 internally prepared financial statements, any

22 accounting statements, any basically money coming in

23 and money going out of the company during that time?

24 A.   That were produced by Mr. Rivkin and his staff?

25 Q.   Yes.

1  A.   There were a number that were located during a

2  search warrant that we conducted, yes.

3  Q.   Okay.  And could you determine from reviewing those

4  statements the level of legitimate business, in your

5  estimation, that would have been going on during that

6  time period?

7  A.   From what we could tell from the bank -- we also

8  reviewed bank records of approximately 60 different

9  types of accounts that he opened.  And from what we

10  could tell, a majority of the activity in the accounts

11  was just money being transferred back and forth, the

12  movement of money.  There was some legitimate business

13  that we could identify in there, but it was a very

14  small amount.  I couldn't tell you specifically how

15  much, but it's a smaller amount than what we saw coming

16  in from the fraudulent RIN sales and the fraudulent tax

17  credits.

18  Q.   What evidence would you say you have in totality

19  that Mr. Rivkin knew that biodiesel had not been

20  produced?

21  A.   From the number of witnesses that we spoke to that

22  said he was aware that it was not being produced, from

23  the number of witnesses that said the plant was never

24  producing biodiesel with the exception of that one test

25  batch, with witnesses that told us they spoke to him

1  and told him the plant is not working, we can't -- you

2  know, we can't do what you want to do.

3  Q.   Do you have any internal company emails regarding --

4  regarding the fact that Green Diesel was allegedly not

5  producing biodiesel?

6  A.   Not to my knowledge, no.

7  Q.   And have you reviewed internal company emails?

8  A.   We have reviewed some, yes.

9  Q.   To your knowledge, do they contain any evidence to

10  support the charges in this case?

11  A.   The review of the internal emails was very

12  difficult for us because he -- Mr. Rivkin had an

13  attorney on staff.  So most of the -- the attorney was

14  CC'd on most of the emails so that it became taint

15  material.  So we were very limited into what we could

16  actually look at.

17  Q.   And based on what you did actually look at, did you

18  find any evidence to support the charges in this case?

19  A.   No, they were all just verbal conversations, to my

20  knowledge.

21  Q.   Has Mr. Rivkin made any admissions regarding the

22  allegations in this case?

23  A.   No, I've not -- ever spoke to me personally?

24  Q.   To you or any other agents in this case?

25  A.   No, we've never spoken to him before this week.

1  Q.   Were any consensual phone calls or anything of that

2  nature --

3  A.   No.

4  Q.   -- conducted with other individuals?

5       To your knowledge, does anyone in Mr. Rivkin's

6  family, are any of them involved in these allegations?

7  A.   No.

8  Q.   Were the buyers of the RINs aware that they were

9  not supported by actual biodiesel?

10 A.   They were not aware of that until at a later time

11 when they were notified by the EPA that there was the

12 discovery made that Green Diesel had not actually been

13 producing biodiesel, so therefore the RINs were

14 invalid.  And that's when the energy companies became

15 aware that they had been defrauded.

16 Q.   Would there have been any responsibility on their

17 part to ensure that these RINs were backed by the

18 actual production or purchase of biodiesel?

19 A.   I can't speak to that.  My understanding is that

20 the program is a self-report.  Then it's incumbent upon

21 Mr. Rivkin to be honest and truthful and then incumbent

22 upon the oil companies to also recognize that biodiesel

23 should be being produced.  But I don't know anything

24 beyond that.

25 Q.   How did this investigation first begin?  How did

1  the EPA know to look into this as potential fraud?

2  A.   When they were reviewing some of their electronic

3  documents, the electronic documenting system that they

4  have, they began to see there were large numbers of

5  RINs being produced along with gallons being reported

6  by Mr. Rivkin.  So they became suspicious and began to

7  look into what was truly happening with Green Diesel.

8  Q.   Were the gallons, I guess, that were alleged to be

9  created or converted as biodiesel, maybe -- I don't

10  know the proper terminology -- would it be possible for

11  that quantity of biodiesel to be created within that

12  time period given his factory?  Did it have something

13  to do with --

14         MS. LEHNERT:  Objection, Your Honor, this is

15  calling for speculation on the part of the witness.

16         THE COURT:  Sustained.

17         MS. LEHNERT:  This goes beyond the weight --

18         THE COURT:  Sustained.

19  BY MS. BELLINGER:

20  Q.   Well, you indicated that there were very large

21  amounts of biodiesel being created and that's what

22  tipped off the EPA; correct?

23  A.   That there were large amounts being reported --

24  Q.   Reported.

25  A.   -- through the EMTS system to the EPA.

1  Q.   Okay.  And were these amounts atypical of other

2  companies engaged in the same activity?

3  A.   That's what I understand.  When the EPA actually

4  began looking into Mr. Rivkin and Green Diesel, they

5  found that he was one of the largest producers of RINs

6  in the country at the time.  So it became suspicious

7  because there weren't any other companies that were

8  producing the volume that he was claiming that he was

9  producing.

10  Q.   What was the first action taken at that time?  Was

11  that when a request was made or an inspection was done?

12  A.   My understanding, that's when the inspection was

13  done.

14  Q.   Okay.  and was the inspection -- as a result of the

15  inspection, did the EPA feel as though it had inclusive

16  evidence at that time that fraudulent activity had

17  occurred?

18        MS. LEHNERT:  Objection, Your Honor.  Again,

19  this is calling for a conclusion on the part of the

20  witness that isn't relevant here to the weight of the

21  evidence.

22        THE COURT:  Rephrase that question,

23  Ms. Bellinger.

24  BY MS. BELLINGER:

25  Q.   At the time that the inspection occurred, was it

1  clear to the inspectors that it was not possible that

2  this amount of biodiesel had either been created or

3  purchased in this facility?

4  A.   My understanding was that they -- that they were

5  concerned, and so that's why they reported to -- there

6  are two different sides of the EPA, the civil side and

7  the criminal side, and they reported to the criminal

8  side that they should initiate a criminal investigation

9  because they were concerned that the amount of RINs in

10 gallons that were claimed that they were being produced

11 were not, in fact, being produced.

12 Q.   So, when they inspected the facility, they

13 determined that more investigation was necessary?

14 A.   They turned the case over to the criminal side,

15 which is, from what I understand, you know, a

16 completely different entity or unit within the EPA.

17 Q.   So, could they tell just by walking into the

18 facility that the RINs were created?

19 A.   I have no idea.

20 Q.   Do you know whether Mr. Rivkin was advised of

21 potential criminal charges prior to moving out of the

22 country?

23 A.   He was not advised, no.  Whether he suspected that

24 there was something coming, I have no idea.  There were

25 a couple of other major investigations being conducted

1  at that time frame on other biodiesel producers, and

2  so the word that we had gotten from staff is that

3  everybody had become very nervous because they were --

4  "everybody" meaning the staff that was working at Green

5  Diesel, Fuel Streamers, his various companies, because

6  they knew that these other cases were taking place,

7  these other individuals were being indicted; and that

8  Mr. Rivkin, they believed there was a problem with the

9  RINs and that he actually may be criminally responsible

10 for reporting that he had, in fact, produced biodiesel

11 that he had not.

12 Q.   In response to EPA inquiries, Mr. Rivkin's -- were

13 Mr. Rivkin's responses prepared by attorneys or were

14 the --

15 A.   My understanding is yes, they were prepared

16 through his attorneys and forwarded by his attorneys.

17 Q.   Okay.  And do you know the names of those

18 attorneys?

19 A.   It's a group out of Dallas.  Roper and -- I'm

20 sorry, I know that he had a number of attorneys and I'm

21 trying to remember exactly which ones were the civil

22 side versus the criminal side.

23 Q.   Okay.  Were these his civil attorneys?

24 A.   They represented the company, from what I

25 understand, and not him personally.

1  Q.   And had they already been involved in representing

2  the company prior to the EPA request?

3  A.   That I do not know.

4        MS. BELLINGER:  Nothing further, Your Honor.

5        THE COURT:  Ms. Lehnert?

6        MS. LEHNERT:  Thank you, Your Honor.

7                  **REDIRECT EXAMINATION**

8  **BY MS. LEHNERT:**

9  Q.   Just to follow up on a few things, Agent Bauer.

10        Ms. Bellinger was asking you about the

11  information that was submitted by Mr. Rivkin and his

12  attorneys.  Did Mr. Rivkin submit a certification that

13  was signed by him --

14  A.   Yes, he did.

15  Q.   -- as part of the information he submitted to EPA?

16  A.   Yes, he did.

17  Q.   And based on your investigation, do you recall

18  when the inspection was done that EPA conducted at the

19  facility?

20  A.   In August of 2011.

21  Q.   And again, based on your investigation, do you

22  have any information that supports the idea that the

23  facility could produce "on spec" biodiesel at that

24  time?

25  A.   No.

1  Q.   And during the inspection, can you describe for

2  the Court what was observed about the condition of the

3  facility in terms of its ability to operate?

4  A.   Apparently, their appropriate permits were not

5  obtained, so therefore he could not obtain electricity.

6  There were problems with getting steam to the plants,

7  so the plant was not able to run because of a number of

8  issues.

9  Q.   What about piping and other parts of the facility

10 being disconnected?

11 A.   Absolutely.

12 Q.   And I wanted to confirm what I believe I heard

13 from a question Ms. Bellinger asked you.  Regarding

14 Mr. Rivkin's PRIVKIN2 "User ID", is it your

15 understanding that that was exclusive to Mr. Rivkin?

16 A.   Yes.

17 Q.   And that when you asked -- when you mentioned a

18 couple of other employees, Aaron Parrish and John

19 Pierce, is it your understanding they had their own

20 "User IDs" --

21 A.   Yes.

22 Q.   -- for the system that EPA has?

23 A.   Yes.

24 Q.   What is your understanding of when Mr. Rivkin left

25 the country?

1  A.   In November of 2011.

2  Q.   Was that after the EPA inspection?

3  A.   Yes, it was.

4  Q.   And based on your investigation, did you learn any

5  information from any of the witnesses that have been

6  interviewed about whether Mr. Rivkin was leaving

7  because of the EPA inspection?

8  A.   The general consensus in the office was that he was

9  leaving because of the inspection.  The word that we

10  got from staff members is they were very concerned

11  because they felt like he had left the country and left

12  the office floundering.  Around the time that he left,

13  the staff was ordered to shred all the documents in the

14  company that the company had, and so there weren't a

15  lot of documents that were left once he left the

16  country for them to even continue running things.

17  Q.   And based on the "User ID" of PRIVKIN2 being

18  within Mr. Rivkin's exclusive use, were there any RINs

19  generated by anyone else that you're aware of?

20  A.   No.

21  Q.   And is it your understanding that Mr. Rivkin was

22  aware that the facility was not working?

23  A.   Yes.

24  Q.   And who was in charge of RIN sales transactions and

25  coordinating any RIN sales transactions?

1  A.   Was that John Pierce?

2  Q.   And at whose direction did he --

3  A.   He took complete direction from Mr. Rivkin.

4  Q.   And with respect to any alleged legitimate business

5  that Mr. Rivkin had, where was funding coming for that

6  legitimate, based on your review of the bank records in

7  this case?

8  A.   It was being funded by the fraudulent RIN sales.

9  All of the funds were being funneled through one

10 account to the other account.

11          MS. LEHNERT:  Nothing further, Your Honor.

12          THE COURT:  Ms. Bellinger, anything further?

13          MS. BELLINGER:  Just briefly, Your Honor.

14          THE COURT:  All right.

15                    **RECROSS-EXAMINATION**

16 **BY MS. BELLINGER:**

17 Q.   I just wanted to clarify.  I thought on

18 cross-examination I asked if the PRIVKIN2, if anyone

19 else had access to that user name, and you indicated

20 that two other individuals did.

21 A.   No, I'm sorry, I misspoke.  What I was trying to

22 say is there were two other individuals that he had

23 actually instructed to be able to have accounts.  And

24 so that was entirely my fault.  I misspoke.

25 Q.   So I guess throughout your investigation you did

1  not hear that anyone else had access to the PRIVKIN2

2  login?

3  A.   Not to PRIVKIN2, no.

4  Q.   Okay.  And did you hear that he, I guess, directed

5  anyone else to create RINs?

6  A.   There were other individuals that were allowed to

7  create, yes, with their own passwords that they had,

8  but they were completely under the direction of him,

9  from witness testimony.

10 Q.   I think you just testified that the only RINs that

11 were ever created were created by the PRIVKIN2; is that

12 correct?

13 A.   Yes, I'm not making sense, I apologize.  Yes, there

14 were two other individuals who had -- who had access to

15 be able to create RINs, but the ones that we have

16 alleged in the Indictment were just from the PRIVKIN2

17 account.

18 Q.   So additional RINs were created by other people in

19 the company?

20 A.   From my knowledge early on in a time frame that we

21 did not include in the investigation, such as when

22 RINSTAR -- when they were using the RINSTAR, then they

23 were actually going through another company to produce

24 RINs, but those particular RINS were not included in

25 this portion of the Indictment.

1  Q.   But other individuals within Mr. Rivkin's company,

2  at Mr. Rivkin's direction, also created RINs?

3  A.   The only RINs that we have alleged are RINs that

4  were created by PRIVKIN2.

5  Q.   But were there other RINs created?

6  A.   You know, that's not my area of expertise.  We

7  really focused on what he created and we included those

8  as -- in the Indictment for the particular RINs that

9  were false.

10         MS. BELLINGER:  Nothing further, Your Honor.

11                  **EXAMINATION BY THE COURT**

12         THE COURT:  I have some questions.  What do

13  you know about this Marilee address, if anything?

14         THE WITNESS:  The address that is actually

15  listed on the document is owned by another individual,

16  not owned by Mr. Rivkin.  It is a single house.  It is

17  not a core unit.  And we've been over to take a look at

18  it.  We do not show any connection with that particular

19  residence and Mr. Rivkin, his wife, or any family

20  members.

21         THE COURT:  Do you know who owns it?

22         THE WITNESS:  Yes, ma'am.  I ran it.  It's

23  actually -- I don't have the name.  It's easy to come

24  up with HCAD.

25         MS. LEHNERT:  Your Honor, I can provide the

1  name.

2          THE WITNESS:  Yes, thank you.

3          THE COURT:  All right.  But you're saying it

4  has no relation to Mr. Rivkin or his family?

5          THE WITNESS:  No, ma'am, it has no relation.

6  I ran it and I left it in the office.

7          THE COURT:  Okay.  And it's a single-family

8  dwelling, it's not a multi-family complex --

9          THE WITNESS:  Yes, ma'am.  We actually rode

10 over there yesterday and took a look at it and it's

11 single-family.

12         THE COURT:  All right.  And tell me about some

13 artwork that was seized, something about New Jersey

14 or --

15         THE WITNESS:  Yes, ma'am.  We were provided

16 information that there was a large art collection that

17 Mr. Rivkin owned.  And being concerned that the money

18 could possibly be used to be laundered through this

19 art, we had an agent who was able to go out and locate

20 the company in Houston who had possession of it.  We

21 learned that it was shipped to New Jersey and were able

22 to trace the proceeds of the fraud directly to the

23 purchase of the artwork.  So we obtained a seizure

24 warrant and the artwork is currently being stored in

25 New York and the judicial proceedings is still ongoing.

1          THE COURT:  And when did this take place?

2          THE WITNESS:  This was in July of 2012.  The

3    information we had from witnesses is that it was

4    shipped -- it was shipped from Houston to New Jersey,

5    then moved to New York to their docks there.  And the

6    day that we actually seized it, it was scheduled to be

7    shipped to Spain.

8          THE COURT:  Do you know of any family members

9    that Mr. Rivkin has in the Southern District of Texas?

10         THE WITNESS:  I do not.  I know that there

11   were some extended family at some point that were

12   related to his wife, but I do not have the knowledge of

13   any family here.

14         THE COURT:  And I believe Mr. Lombard said the

15   value of the artwork was 15 to 16 million dollars; is

16   that correct?

17         THE WITNESS:  Yes, ma'am.  We showed that he

18   paid approximately 22 million for it, but when we had

19   it appraised, it was actually around 16 million.

20         THE COURT:  Do you know where Mr. Rivkin has

21   bank accounts?

22         THE WITNESS:  We were not able to trace the

23   bank accounts.  There were a number of intermediary

24   banks that were used to facilitate the wires.  We know

25   that there are not -- we were not able to locate any

 1  funds here in the United States.  We've used every

 2  means to our disposal to try and locate those funds,

 3  and it appears that everything has been moved overseas.

 4  That's from our review of the bank records along with

 5  testimony from witnesses.

 6          THE COURT:  Do you know where overseas?

 7          THE WITNESS:  I don't.  I know there was an

 8  allegation that there was some in the Caribbean, some

 9  in Switzerland, I believe some in Spain, and an account

10  with BNP Paribas that is headquartered in Paris, but I

11  don't know exactly where -- haven't been able to find

12  it, Your Honor.

13          THE COURT:  Anything further, Ms. Bellinger?

14          MS. BELLINGER:  No, Your Honor.

15          THE COURT:  Or Ms. Lehnert?

16          MS. LEHNERT:  No, Your Honor.

17          THE COURT:  All right.  Any further witnesses,

18  Ms. Lehnert?

19          MS. LEHNERT:  No, Your Honor.

20          THE COURT:  Can Ms. Bellinger be excused --

21  I'm sorry, Ms. Bauer.  Too many B's.

22          MS. LEHNERT:  Yes, Your Honor.

23          THE COURT:  Okay.  You may step down.  Thank

24  you.

25              Ms. Bellinger, any witnesses or proffers?

1    MS. BELLINGER:  No, Your Honor.

2    THE COURT:  Any argument on the question of

3  pretrial detention?

4    MS. BELLINGER:  Yes, Your Honor.

5    THE COURT:  All right.  Ms. Lehnert, do you

6  have any argument?

7    MS. LEHNERT:  Very briefly, Your Honor.

8    The nature of the charges here, we have a

9  68-count Indictment that, if the defendant were found

10  guilty and convicted and the sentences were to run

11  consecutively, puts him at risk of approximately 846

12  years.  The weight of the evidence, as you've heard the

13  testimony over the past two days, is substantial as far

14  as -- and we also have returned Indictment showing that

15  the Grand Jury did find probable cause to bring this

16  Indictment.  In particular, we're looking at something

17  in excess of $75 million that we have traced to leaving

18  the country that is otherwise unaccounted for.

19    As far as the history and characteristics

20  of the defendant, at this point the critical issues

21  there are that after the EPA began investigating this

22  matter in August of 2011, the defendant left the

23  country in November of 2011 or thereabouts.  And from

24  there, he then secured Guatemalan citizenship under

25  false pretenses based on the expulsion order, and has

 1  since been expelled.  We determined that he had a false
 2  identity down in Guatemala.  He has, as best as we can
 3  tell, substantial financial resources outside the
 4  country based on the evidence that we have in looking
 5  at his bank records.

 6           We are also aware that he has no ties at
 7  this time to Houston.  Whatever ties he had, his wife
 8  and son moved with him to Spain.  He has no property
 9  here.  The only address he lists on his pretrial report
10  is an incorrect one.  And at this point we believe that
11  given his extensive international travels that Agent
12  Lombard testified to, he presents a serious risk of
13  flight and we ask that he be detained pretrial.
14           THE COURT:  Thank you, Ms. Lehnert.
15           Ms. Bellinger?
16      MS. BELLINGER:  Your Honor, we believe that
17  there are conditions that could be put into place that
18  would allow Mr. Rivkin to show up in court and would
19  address any issues that the Court may have regarding a
20  risk of flight.

21           First, we would submit that I understand
22  that the Government has raised some issues on him being
23  a risk of flight regarding ties to other countries and
24  the fact that he moved to Spain.  However, the statute
25  requires that he be a serious risk of flight.

1          Your Honor, there are a few issues that

2   need clarification, and if us providing that further

3   clarification would change the Court's mind, then we

4   will further investigate and provide that clarification

5   at a later time.

6          One is that in speaking with Mr. Rivkin,

7   the address on Marilee Street, he said he's owned

8   several properties historically on that street and

9   cannot remember the street number, but they do

10  currently own a condo in his wife's name on Marilee

11  Street.  We've had some difficulty getting in touch

12  with his wife because she's been en route back to the

13  United States, so we haven't been able to verify the

14  address yet, but we could provide that to the Court if

15  it would be material in the decision.

16         He's indicated that he could live at that

17  condo.  He has a father -- sorry, a brother-in-law and

18  sister-in-law, Cheri Finn and John Finn, as well as his

19  niece, Marissa, that all live here in the Houston area,

20  and could be interviewed and serve as third-party

21  custodians.  He would more than happy to wear any type

22  of ankle monitor and give up any and all passports.

23         He, as I stated, has ties here, but more

24  than anything, in speaking with him, he would never

25  flee federal charges.  He feels as though that would be

1  a bad example to set for his children and he has no

2  intention of doing so.  He's ready to face his

3  responsibility.

4          I'd just like to give some background on

5  issues, clarification on the case.  At the same time

6  and in the same month actually that the EPA inspected

7  the facility in August of 2011, Mr. Rivkin had a very

8  traumatic home invasion.  This is also corroborated by

9  witness statements provided by the Government that

10 other individuals in his company were aware of this

11 home invasion.  Since that time, Mr. Rivkin has

12 suffered from some mental health concerns which were

13 later diagnosed as PTSD and depression.  He indicated

14 to me that when he first arrived in Spain, he spent a

15 year in the house unable to leave or perform any normal

16 functions and only subsequently became functional and

17 got back to his business matters there.

18          Additionally -- and this is corroborated

19 by witness statements provided by the Government -- he

20 did have business in Europe.  Prior to that time, there

21 was the exportation of ethanol that he was involved in

22 and this was a legitimate business outside of this

23 biodiesel issue, and that he had his headquarters in

24 Europe in Antwerp and had been anticipating a move to

25 Barcelona of his headquarters.

1        So those additional two personal and
2   business reasons also facilitated his move.
3        His wife, as I stated, is now back here in
4   the country; and as I indicated, he would be more than
5   willing to submit to any conditions that the Court
6   deems appropriate.
7        THE COURT:  All right, thank you,
8   Ms. Bellinger.
9        At this time, Mr. Rivkin, I find by a
10  preponderance of the evidence that there is a serious
11  risk of flight that can't be addressed by any
12  conditions of release that have been proposed at this
13  time.  There aren't any viable conditions that have
14  been proposed.
15       In making that finding, I've taken into
16  account not only the nature and circumstances of the
17  offense, but also the weight of the evidence against
18  you and your own personal history and characteristics.
19  In making this finding, I take note of the fact that
20  you were expelled from Guatemala based on the fact
21  that you obtained -- they report that you obtained
22  citizenship there fraudulently and were engaged in
23  fraudulent business activities there.  You have no ties
24  to this district.  I think you gave false information
25  to the Pretrial Services Agency in regard to addresses

here in Houston. You have no family here that has been

presented. You have no business ties to this district

any more. There is the issue of the artwork that was

seized on its way out of the country that was worth

substantial sums of money. You have apparently access

to funds outside the United States that are unaccounted

for.

And there are no conditions at this time

that have been presented, Ms. Bellinger, that I think

would reasonably assure Mr. Rivkin's appearance at

trial.

So, for that reason, I'm going to remand

you to the custody of the U.S. Marshals. They will

make certain that you get back and forth to trial on

the days -- to court on the days you need to be here.

If it's possible, they will keep you separated from

those people who have been convicted of a crime and who

are waiting to find out what their punishment is, as

well as separated from those people who have been

convicted and punished for some time, but who have

their cases on appeal.

And you do have the right to have private

meetings with your attorneys. Ms. Bellinger knows how

to make arrangements for those private meetings with

her, her colleagues, or investigators with her office.

1      Now, I would like to give you the

2 opportunity to plead not guilty to the charge this

3 afternoon so that your trial date can be set and you

4 can begin working on fighting the charges.

5      And if there are any viable conditions of

6 release that you can propose, Ms. Bellinger, be sure

7 and bring them to my attention.  And again, if there's

8 anything in the Grand Jury transcript, be sure and let

9 me know that as well.

10      MS. LEHNERT:  Your Honor.

11      THE COURT:  Yes.

12      MS. LEHNERT:  May I ask a question just for

13 clarification --

14      THE COURT:  Sure.

15      MS. LEHNERT:  -- so that we're all on the same

16 page with respect to the Grand Jury transcript?

17      THE COURT:  Sure.

18      MS. LEHNERT:  I'll obviously be putting in a

19 request for that as soon as possible.

20      THE COURT:  Sure.

21      MS. LEHNERT:  Once I secure the Grand Jury

22 transcript, do I provide a copy only to you or do I

23 provide a copy to both you and Ms. Bellinger?

24      THE COURT:  Oh no, just give it to

25 Ms. Bellinger.  I don't need to get it.

1          MS. LEHNERT:  Okay.

2          THE COURT:  Mr. Rivkin, you did receive a copy

3  of the Indictment; correct?

4          DEFENDANT RIVKIN:  Yes, Your Honor.

5          THE COURT:  And you understand that in that

6  Indictment you're accused of engaging in activity

7  which, if proven, would be wire fraud, mail fraud,

8  violations of the Clean Air Act, and money laundering?

9  You understand those accusations?

10          DEFENDANT RIVKIN:  Yes, Your Honor.

11          THE COURT:  Do you understand further that if

12  you were found guilty beyond a reasonable doubt of any

13  of those accusations, the judge who's hearing your case

14  would have to punish you in some way?

15          DEFENDANT RIVKIN:  Yes, Your Honor.

16          THE COURT:  In this case, Ms. Lehnert, what's

17  the range of punishment to which Mr. Rivkin would be

18  subject if you can prove these accusations?

19          MS. LEHNERT:  With respect to Counts 1 through

20  16, which are charges brought that are wire fraud

21  charges, not more than 20 years, along with a fine that

22  could be up to 250,000 or not more than 250,000, but

23  also an alternative fine based on gain of loss.

24          Under Counts 17 through 19, which are mail

25  fraud charges, again, the term for imprisonment is not

1  more than 20 years, a fine that may be an alternative
2  fine based on gain or loss, or not more than 250,000.
3          Counts 20 through 22 are Clean Air Act
4  false statements.  Those charges bring an imprisonment
5  term of not more than two years, with a fine, either an
6  alternative fine based on gain or loss or not more than
7  250,000.
8          And Counts 23 through 68 are money
9  laundering charges under 18 U.S.C. 1957.  A term of
10 imprisonment is not more than 10 years.  A fine is an
11 alternative fine based on gain or loss or up to
12 250,000, or also an alternative fine of not more than
13 twice the amount of criminally derived property
14 involved in the transaction, which in this case is
15 alleged to be 29 million.
16         And for Counts 1 through 16, 17 through
17 19, and 23 through 68, a three-year supervised release.
18      THE COURT:  And I'll remind you, Mr. Rivkin,
19 that supervised release means that you would have to
20 live under court rules of supervision even after
21 discharged from prison.
22      DEFENDANT RIVKIN:  Yes, Your Honor.
23      THE COURT:  Do you understand all the possible
24 consequences if the Government can prove any of these
25 accusations against you?

1    DEFENDANT RIVKIN:  Yes, Your Honor.

2    THE COURT:  Now, I'm sure Ms. Bellinger has

3  told you that you have the right to have Ms. Lehnert

4  read to you every word of that Grand Jury Indictment

5  before you enter your plea of not guilty.  Would that

6  be necessary?

7    DEFENDANT RIVKIN:  No, Your Honor.

8    THE COURT:  All right, then how do you plead

9  to those counts of the Indictment in which you're

10  named?

11    DEFENDANT RIVKIN:  Not guilty, Your Honor.

12    THE COURT:  On your plea of not guilty, your

13  trial date has been set aside for you already.  You're

14  scheduled to go to trial on September 15th at 9:00 in

15  the morning.  You'll have to be in court ready for

16  trial on that day.

17    You'll also have to be in court on

18  September 8th at 8:45 in the morning.  That's the last

19  meeting that the judge will have with the lawyers to

20  make certain that everybody is ready for trial.  You

21  may have to answer some questions or make a decision

22  on that day, so you have to be present to assist your

23  lawyer then.

24    I'm going to give you a copy of this trial

25  schedule.  You'll see some other dates on there.  They

1  are deadlines for the lawyers to give information to

2  your trial judge so that there's no unnecessary delay

3  in getting your case resolved.  I want you to sign the

4  original of this trial schedule and you'll get a copy

5  of it, as well.

6            Do you have any questions, Mr. Rivkin?

7            DEFENDANT RIVKIN:  No, Your Honor.  Thank you.

8            THE COURT:  All right.  Then once you sign

9  this and get your copy, the Marshals will take you

10 upstairs.

11           Anything else --

12           MS. BELLINGER:  Your Honor, may I address two

13 matters?

14           THE COURT:  Yes, sure.

15           MS. BELLINGER:  I apologize.

16           THE COURT:  Oh, there's one matter I need to

17 address with you, and that is, when Ms. Meyers was in

18 court last week, I asked her for a financial statement

19 under seal so that I could address a repayment to the

20 Criminal Justice Fund on Mr. Rivkin's behalf.

21           MS. BELLINGER:  Yes, Your Honor, that was one

22 of the issues I wanted to address.  I just wanted some

23 clarification on what the Court is requesting.  I

24 assume it's not just based upon here and submitted to

25 Pretrial Services.

1        THE COURT:  No, because there was --

2    Mr. Rivkin didn't have the information about his

3    foreign bank accounts, and I need that information so I

4    can determine how much he should repay.

5        MS. BELLINGER:  Okay.

6        THE COURT:  Because he needs to repay some

7    money to the Criminal Justice Fund.

8        MS. BELLINGER:  So, basically, foreign bank

9    accounts or assets --

10        THE COURT:  From which I can call some money

11    to help repay the public.  Okay?

12        MS. BELLINGER:  Thank you, Your Honor.  I had

13    two other issues just regarding -- because the Court

14    has ordered him detained.

15            One is that he is currently or he was on

16    medication and is currently going through withdrawals

17    from the medication with depression, and he is worried

18    his mental state will decline if he doesn't get back on

19    that medication quickly.  I just wanted to advise the

20    Court of that.

21        THE COURT:  Where is he being held?

22        MS. BELLINGER:  Joe Corley.  And that's our

23    other request.  Given the complexity of this case, as

24    the Court can see, I expect voluminous discovery and a

25    lot more meetings with the client than are required of

```
 1  a typical case.  We'd ask the Court to consider and
 2  order that he be held at FDC to assist with his defense
 3  in this case.
 4          THE COURT:  Okay.  I don't have a problem with
 5  that.  Let me ask the Marshals two things:
 6              Where will Mr. Rivkin get a quicker visit
 7  with the doctor?  At the FDC or at Joe Corley?
 8          DEPUTY MARSHAL:  We can make a call to Joe
 9  Corley and they will --
10          THE COURT:  Okay.
11          DEPUTY MARSHAL:  -- make sure he gets seen.
12          THE COURT:  Okay.  Have him see the doctor
13  immediately at Joe Corley so he can get whatever
14  medication he needs to get on, and then see if he can
15  be transferred to the FDC.  And I'll order that if it's
16  available.  Okay?
17          DEPUTY MARSHAL:  Okay.
18          THE COURT:  Anything else?
19          MS. BELLINGER:  Thank you very much, Your
20  Honor.
21          THE COURT:  All right, thank you.
22          MS. LEHNERT:  Thank you, Your Honor.
23          THE COURT:  Y'all can be excused.
24          [4:00 p.m. - Proceedings adjourned]
25
```

# C E R T I F I C A T I O N

     I certify that the foregoing is a correct
transcript of the electronic sound recording of the
proceedings in the above-entitled matter.

/s/ Gwen Reed
8-26-14